# COURT OF APPEALS OF VIRGINIA

---

**Record No. 1893-24-2**

---

EBONY C. JONES, S/K/A
EBONY CHARISSE JONES
v.
COMMONWEALTH OF VIRGINIA

---

Present: Judges Beales, O'Brien and Ortiz

Argued at Richmond, Virginia

Opinion Issued July 7, 2026

---

## FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
David E. Johnson, Judge

Monica Tuck, Assistant Public Defender (Virginia Indigent Defense Commission, on briefs), for appellant.

Shelly R. James, Senior Assistant Attorney General (Jason S. Miyares,[1] Attorney General, on brief), for appellee.

---

### PUBLISHED OPINION BY
### JUDGE DANIEL E. ORTIZ

It is a criminal offense in this Commonwealth for any person, including an employed caregiver, to engage in financial exploitation of a vulnerable adult in order to steal their money from them under Code § 18.2-178.1. The 2022 amendments to the statute bolster the protections extended to "vulnerable adults," as defined under Code § 18.2-369(C). Ebony C. Jones appeals her conviction for financial exploitation of her client, M.S.,[2] under Code § 18.2-178.1(B) on grounds of legal and factual insufficiency. She argues that the statute's "use" requirement requires proof of the

---

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

[2] Due to the nature of the case, M.S. is not identified by name.

specific method of taking to support conviction. Rejecting Jones's arguments on appeal, we affirm her conviction.

BACKGROUND[3]

M.S. was paralyzed from the chest down in a car accident in 2007. M.S. sustained no brain damage from the accident, but her paralysis left her bedbound and frequently heavily medicated. As a result, she required around-the-clock care and assistance with her daily activities such as bathing, getting dressed, and eating. After the accident, her adult son, Brian S., became M.S.'s medical and financial power of attorney, and he established an LLC to hire caregivers for his mother. Although Brian and her caregivers arranged outings for M.S., she was sometimes sad and often expressed feeling that "she didn't have control over her own life anymore."

Although Brian held financial power of attorney, it was important to M.S. that she remain involved in her finances. Brian and his daughter handled most of M.S.'s money matters, keeping track of both M.S.'s personal bank account and the separate payroll account he established to pay caregivers through the LLC. M.S. was "pretty good" about reading and comprehending her financial documents but did not have complete confidence in her decision-making. M.S. had access to checks, a debit card, and a credit card which she could use without Brian's authorization. She was able to shop for herself, although she rarely did so. Her main expenditures were for medical supplies and equipment, a constant necessity. Brian set up an iPad at M.S.'s house for medical supply orders. He linked the iPad to an Amazon account and

---

[3] "We recite the facts in the light most favorable to the Commonwealth, the prevailing party below." *Sadler v. Commonwealth*, 276 Va. 762, 764 (2008). In doing so, we are required to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all . . . credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cooper v. Commonwealth*, 54 Va. App. 558, 562 (2009) (quoting *Parks v. Commonwealth*, 221 Va. 492, 498 (1980)).

several online food delivery platforms, all of which were connected to M.S.'s personal bank account for payment. Jones and other caregivers had access to the iPad and regularly used it to place orders.

Brian S. hired Ebony Jones as a caregiver for M.S. in the first few years after M.S.'s accident. She became extremely close to the family over time, even once accompanying M.S. on a family vacation. While Jones worked elsewhere for a few years, Brian happily rehired Jones in 2017 because she "did a wonderful job" of providing caregiving services and he considered her "an asset" as an employee.

As she aged, M.S. began to experience memory issues, which became most notable at the end of 2022. Although M.S. never received a formal diagnosis, her symptoms reminded Brian of other family members who had suffered from dementia. These symptoms were not constant: M.S. would be fine for "a week or two . . . and then [there would be] three or four days where she would not be with it at all." On bad days, M.S. would have trouble with names and faces. She began to mistake Brian for his deceased father and would sometimes become confused about who her caregivers or grandchildren were, or why they were in her house. Brian found those periods difficult, because he could see that M.S. "would know something wasn't right but she couldn't put together what it was." She became less active and slept for much of the time during those periods.

But even on good days, M.S. would frequently ask Brian for a second opinion before making financial decisions. Jones once asked M.S. to lend her money for a water heater repair, and M.S. consulted Brian before deciding whether to do so. M.S. did loan Jones the money, but no repayments were ever made despite Jones's agreement to start repayment in early 2023. Even as M.S.'s memory issues worsened, she and Brian continued making her financial decisions "together."

In December 2022, Jeffrey Bracewell, M.S.'s bank representative, contacted Brian after he noticed an unusually low balance in M.S.'s personal bank account. While reviewing the account's statements, Bracewell had noticed a series of transactions transferring M.S.'s money to an American Express account throughout the latter half of 2022. After Brian confirmed that M.S. did not have an account with AmEx, Bracewell contacted the bank's fraud department. This investigation, and a subsequent forensic audit by Detective Michael Rogers of the Chesterfield County Police, matched the suspicious transactions to the AmEx account, and identified other institutions that received suspicious transfers from M.S.'s account. Jones was the account holder on the AmEx account, and all of the other suspicious transactions also matched accounts held by either Jones or her husband. The payments made to these accounts were as follows:

> in the month of July 2022, there were 26 payments totaling $7,255.99; in the month of August 2022, there were 44 payments totaling $16,649.50; in the month of September 2022, there were 20 payments totaling $10,584.99; in the month of October 2022, there were 17 payments totaling $11,970.13; in the month of November 2022, there were 20 payments totaling $10,889.00. In sum, there were 127 unauthorized payments totaling $57,348.61 to accounts controlled by the defendant.

When Brian shared the results of the investigation with M.S., she was "in total shock[ and] disbelief" that Jones had taken the money. "She was just devastated that somebody she trusted so much could do something like this . . . . She was heartbroken, just deeply heartbroken." The next time Jones came to work, Brian asked her about the suspicious transfers, but she claimed to know nothing about them. At that point, Brian suspended Jones's employment.

Detective Rogers testified that he interviewed Jones in March 2023 about the suspicious transactions. Jones admitted that she had paid some of her personal bills using M.S.'s checking account. Jones explained that M.S. allowed herself and the other nurses to use M.S.'s bank

account information to write checks for M.S. She also told the Detective that M.S. allowed Jones to use the account information to pay off her credit card bills and that they had an agreement for upfront payment in exchange for later work. When prompted by the Detective, Jones acknowledged that M.S. had dementia and other disabilities which required assistance. But Jones claimed that M.S. told her not to share their agreement, which was not put in writing, with anyone, including Brian, because M.S. and Brian were not on speaking terms at the time. When Detective Rogers asked "if she knew she was in trouble," Jones responded, "yeah."

Jones was indicted for financial exploitation of a vulnerable adult under Code § 18.2-178.1(B). At the close of the Commonwealth's case-in-chief, Jones moved to strike the charge, arguing that Code § 18.2-178.1(B) was inapplicable because Jones did not commit the taking "through the use of" M.S.'s impairment, and that Jones lacked the "intent to permanently deprive" M.S. of the money. She contended that although M.S. was a "vulnerable adult" under Code § 18.2-369(B) due to her physical disability of paralysis, M.S.'s age-related cognitive decline did not affect her ability to "safeguard" her finances, so the taking could not have occurred "through the use of" her impairment. The trial court denied the motion.

The jury returned a guilty verdict, and the trial court found Jones guilty of financial exploitation of a vulnerable adult under Code § 18.2-178.1. The trial court sentenced Jones to 90 days of active incarceration and an additional three-year suspended sentence on condition of Jones's completion of three years of post-release supervision. She was also ordered to pay restitution in the amount of $35,448.94. Jones appeals.

ANALYSIS

When "statutory interpretation is necessary to resolve [the] particular sufficiency issue, this Court reviews that aspect de novo." *Park v. Commonwealth*, 74 Va. App. 635, 656 (2022). Otherwise, when reviewing the sufficiency of the evidence, "the judgment of the trial court is

presumed correct and will not be disturbed unless it is 'plainly wrong or without evidence to support it.'" *Pijor v.* Commonwealth, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680). "[I]f there is evidence to support the conviction, the reviewing [C]ourt is not permitted to substitute its judgment, even if its view of the evidence might differ from the conclusions reached by the finder of fact at the trial." *Linnon v. Commonwealth*, 287 Va. 92, 98 (2014) (quoting *Lawlor v. Commonwealth*, 285 Va. 187, 224 (2013)). Rather, the only relevant question on appeal is "whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

Under Code § 18.2-178.1,

> it is unlawful for any person who knows or should know that another person is a vulnerable adult to, through the use of that other person's impairment, take, obtain, or convert money or other thing of value belonging to that other person with the intent to permanently deprive him thereof. Any person who violates this section shall be deemed guilty of larceny.

Code § 18.2-178.1(B).

On appeal, Jones contends that the evidence was insufficient to prove that she took money "through the use of" M.S.'s impairment because she did not specifically use M.S.'s physical disability or mental impairment to access M.S.'s banking information. Her arguments give this Court the opportunity to interpret, for the first time, the meaning of "through the use of" under Code § 18.2-178.1(B). Because Jones's appeal hinges on the meaning of the code, we first address whether Jones took the money "through the use of" M.S.'s impairment within the meaning of Code § 18.2-178.1(B) before considering whether the evidence was sufficient to convict her of the offense.

- 6 -

I. The "use" requirement of Code § 18.2-178.1 reflects the legislature's intent to protect vulnerable adults from financial exploitation.

Jones concedes that M.S. was a "vulnerable adult" within the meaning of Code § 18.2-369(C) by nature of M.S.'s paraplegia. But Jones argues that the Commonwealth failed to prove the taking occurred "through the use of [M.S.]'s impairment" under Code § 18.2-178.1(B) because there was no showing of how Jones exploited M.S.'s physical disability to gain her account information, as required under the statute. She also posits that the statute required a finding that M.S. was vulnerable as to her finances, specifically.

"Statutory interpretation presents a pure question of law and is accordingly subject to de novo review by this Court." *Jones v. Commonwealth*, 296 Va. 412, 414-15 (2018) (quoting *Washington v. Commonwealth*, 272 Va. 449, 455 (2006)). Each part of a statute "is presumed to have some effect and no part will be considered meaningless unless absolutely necessary." *Hubbard v. Henrico Ltd. P'ship*, 255 Va. 335, 340 (1998).

In 2022, the General Assembly amended both Code §§ 18.2-178.1(B) and -369(C) to expand the class of persons protected under the statute. Prior to that amendment, Code § 18.2-178.1(B) prohibited financial exploitation of "incapacitated adults," or any person over 18 years old "who is impaired by reason of mental illness, intellectual disability, physical illness or disability, advanced age or other causes to the extent the adult *lacks sufficient understanding or capacity* to make, communicate or carry out reasonable decisions *concerning his well-being*," Code § 18.2-369; 2022 Va. Acts ch. 259 (emphases added).

In removing the term "incapacitated adult" and its accompanying definition, the legislature substituted all references to "incapacitated person[s]" with the term "vulnerable adult," or

> any person 18 years of age or older who is impaired by reason of
> mental illness, intellectual or developmental disability, physical
> illness or disability, or other causes, including age, to the extent the

- 7 -

adult lacks sufficient understanding or capacity to make, communicate, or carry out reasonable decisions concerning his well-being *or has one or more limitations that substantially impair the adult's ability to independently provide for his daily needs* or safeguard his person, property, or legal interests.

Code § 18.2-369(C) (emphasis added).

A. *The plain language of the statute supports Jones's conviction.*

We begin with the plain language of the statute. The operative term at issue in "through the use of" is "use." When, as here, a statute contains a term with no express definition, "the general rule of statutory construction is to infer the legislature's intent from the plain meaning of the language used." *Williams v. Commonwealth*, 84 Va. App. 99, 112 (2025) (en banc) (quoting *Matzuk v. Price*, 70 Va. App. 474, 483 (2019)). To find the ordinary meaning "'courts can look to dictionary definitions,' or 'pertinent analysis in prior case[s].'" *Id.* (alteration in original) (first quoting *Davenport v. Utility Trailer Mfg. Co.*, 74 Va. App. 181, 196 (2022); and then quoting *Eley v. Commonwealth*, 70 Va. App. 158, 165 (2019)). Webster's dictionary defines "use" as "to put into action or service: to avail oneself of: EMPLOY . . . to carry out a purpose or action by means of: UTILIZE[,] also: MANIPULATE."

It follows that the statutory proscription on takings done "through the use of [a vulnerable person]'s impairment" intends to target takings committed through manipulating or taking advantage of the very effects of the condition which qualifies a person as a "vulnerable adult" under Code § 18.2-369(C). Among other things, those effects naturally include the ways in which the vulnerable adult's impairment prohibits them from independently caring for themselves. For example, for a physically disabled adult in need of home care services, the deterrent effect of Code § 18.2-178.1(B) is aimed at those who—professionally or otherwise—provide that caregiving and thereby access that person. The statute does not distinguish between the professional or personal

- 8 -

nature of the relationship between the vulnerable adult and the caregiver, but rather on the impaired person's decreased ability to exercise autonomy and personal control in their life.

Still, Jones maintains that the "use" requirement of Code § 18.2-178.1(B) required proof that Jones obtained M.S.'s account information "through the use of Ms. Smith's inability to move her lower extremities." But her interpretation of the "through the use of" element of the statute is at odds with a plain reading of the statute. In the context of Code § 18.2-178.1(B), the term "use" encompasses behavior of any sort which exploits a vulnerable adult by weaponizing their vulnerability against them in a way they are unable to defend against.

It is well-established that M.S. was "vulnerable" under Code § 18.2-369(C) by way of her physical disability of paraplegia. Jones was employed as a caregiver under M.S.'s home-care plan and only had access to M.S. and her home because of that disability of paralysis. M.S.'s disability required her to have access to a constant flow of medical supplies, and Brian helped his mother gain autonomy over medical purchases by setting up an iPad to that exact end; but Jones exploited M.S. by gaining unlawful access to and use of that iPad to take M.S.'s money for her own personal use. As a professional entrusted with M.S.'s care, Jones's access to M.S., her home, and her iPad, was the only possible way for Jones to access M.S.'s financial information. By manipulating that access to gain M.S.'s banking information, Jones "used" M.S.'s impairment against her, and because Jones's behavior clearly fits within the prohibition contained in the statutory text, we continue our analysis.

B. *The legislative intent behind Code § 18.2-178.1's prohibition further supports our holding.*

"Although we construe statutes strictly in criminal cases, we will not apply 'an unreasonably restrictive interpretation of the statute' that would subvert the legislative intent expressed therein." *Rose v. Commonwealth*, 53 Va. App. 505, 509-10 (2009) (quoting *Ansell v.*

*Commonwealth*, 219 Va. 759, 761 (1979)). In this case, the legislative intent clearly supports our interpretation of the statute. This Court has previously remarked that the 2022 amendments demonstrated clear legislative intent to broaden protection for "adults who are vulnerable due to a physical or mental condition that impairs their ability to make decisions and care for themselves." *Fergeson v. Commonwealth*, 84 Va. App. 80, 93 (2025) (discussing the evidence sufficient to support a finding that a person was a "vulnerable adult" under Code § 18.2-369(C)), *aff'd*, ___ Va. ___ (Apr. 23, 2026). Today, we reaffirm this holding.

Although she became close with M.S. and her family, Jones's relationship to M.S. was a professional one, and her employment as a caregiver began a few years after the accident which resulted in M.S.'s paralysis. Caregiver abuse is *exactly* the type of predatory behavior the General Assembly intended to criminalize. Jones's presence in M.S.'s home was purely a professional caregiving relationship and her role was to provide M.S. with necessary support in that capacity. Consistent with the 2022 amendments, we find that Code § 18.2-178.1(B) encompasses the actions of caregivers who unfairly exploit those entrusted to their care. Our interpretation of the statute is directly in line with the legislature's intent in expanding the scope of the statute's protection for vulnerable adults. Given the plain meaning of the word "use" and the legislature's intent to broaden the protected class, to support a conviction under Code § 18.2-178.1(B) the Commonwealth was required to prove that Jones used M.S.'s physical vulnerability—or its effects—to perform a taking. For the reasons discussed below, the Commonwealth carried that burden.[4]

---

[4] We decline to reach Jones's second assignment of error because M.S. is a "vulnerable adult" within the meaning of the statute. The trial court found that M.S. was a "vulnerable adult" as defined in Code § 18.2-369(C) due to both (1) her paralysis and (2) her age-related cognitive decline. On appeal, Jones argues that the evidence failed to show that M.S. was a "vulnerable adult" for any reason other than her physical disability, due to the intermittent nature of M.S.'s memory issues. This argument fails, however, because the statute does not require the Commonwealth to prove both. This Court presumes that "the legislature says what it means and

II. The evidence was sufficient to support Jones's conviction.

A. *Jones took the money through the use of M.S.'s impairment.*

Under familiar principles, we review challenges to the sufficiency of the evidence for plain error. *Pijor*, 294 Va. at 512. On appeal, this Court has no authority to reweigh the evidence. *Nusbaum v. Berlin*, 273 Va. 385, 408 (2007). Rather, it is the jury who is charged with weighing the evidence and assessing witness credibility. *Barrett v. Commonwealth*, 231 Va. 102, 107 (1986). The jury has "the right to reject that part of the evidence believed by them to be untrue and to accept that found by them to be true. In so doing, they have broad discretion in applying the law to the facts." *Belton v. Commonwealth*, 200 Va. 5, 9 (1958). Our only task on review is to determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Sullivan*, 280 Va. at 676 (quoting *Jackson*, 443 U.S. at 319).

Jones argues that there was insufficient evidence to support a finding that she took M.S.'s money "through the use of" M.S.'s impairment as required by Code § 18.2-178.1(B). She reasons that the evidence presented at trial merely showed that she "used" her *general* access to M.S.'s home to obtain her account information and that this distinction dictates a reversal. But as detailed in the section above, her interpretation of the statute is misguided. At trial, Brian testified that Jones was hired as a caregiver and that caregivers were employed and paid through the LLC. He also explained that caregivers were present in the home at all times of day and night to attend to

means what it says." *In re Woodley*, 290 Va. 482, 491 (2015). A person qualifies as a "vulnerable adult" when their condition satisfies any one of the criteria outlined in Code § 18.2369(C). *See Fergeson*, 84 Va. App. at 85 (discussing the qualifying causes and conditions—listed or otherwise—which would support a finding of vulnerability under subsection (C)); *see also Lewis v. Commonwealth*, 267 Va. 302, 314-15 (2004) (explaining that the use of the disjunctive "or" within a list of statutory criteria demonstrates "the availability of alternative choices" to satisfy that criteria, where proof of the presence of any one of the factors is sufficient to satisfy the statutory requirement (quoting *Hendrick v. Commonwealth*, 257 Va. 328, 340 (1999))).

M.S.'s medical needs. For ease, the care team was given authority to purchase medical supplies but was *not* authorized to access M.S.'s banking information. This evidence was sufficient to support a finding that Jones took M.S.'s money "through the use of" her disability.

By nature of her physical disability, M.S. required constant medical care and assistance. M.S.'s caregiving team had access to an iPad for the sole purpose of ordering necessary medical supplies for her. The iPad was loaded with M.S.'s personal bank account information to ensure payment for the personal and medical supply purchases made by and on behalf of M.S.: caregivers were not allowed to access that bank account directly. All care employees were paid through the LLC established by Brian, from a separate account dedicated entirely to payroll. It was unlike M.S. to make financial decisions without first consulting Brian, who, alongside his daughter, managed her personal account and most of her other money matters.

Under these circumstances, proof of the *method* by which Jones gained access to M.S.'s account information is not necessary to secure a conviction. The plain language of Code § 18.2-178.1(B) merely requires that a person "who knows or should know" of the vulnerability of another "take[s], obtain[s], or convert[s] money" "through the use of that other person's impairment" and with "intent to permanently deprive" them of it. The Supreme Court has long recognized that "[c]ircumstantial evidence is as acceptable to prove guilt as direct evidence, and in some cases, such . . . proof of intent or knowledge[] . . . is practically the *only* method of proof." *Parks v. Commonwealth*, 221 Va. 492, 498 (1980).

This case gives us no reason to depart from that proof structure. M.S.'s physical disability of paralysis prevented her from living independently, which made her more vulnerable to predatory behavior. By the nature of Jones's employment as a caregiver, she was entrusted with caring for and supporting M.S. and understood the impact of M.S.'s disability on her life. Further, none of M.S.'s care team were granted access, unrestricted or otherwise, to her banking information.

Regardless of the exact method by which she did so, any access Jones *did* obtain was done "through the use of"—meaning, by inappropriately taking advantage of—her position of employment. But for M.S.'s physical disability, M.S. would not have required Jones's services, and Jones would not otherwise have access to M.S.'s accounts. Accordingly, a finding that Jones took M.S.'s money "through the use of" her disability was not plainly wrong.

B. *Jones intended to permanently deprive M.S. of the money taken from her account.*

Jones also contends there was insufficient evidence to prove that she had the requisite intent to permanently deprive M.S. of her money. Specifically, she claims that her assertion of the existence of a loan agreement between herself and M.S. negates any evidence to the contrary. She also maintains that any evidence of intent to permanently deprive M.S. is equally susceptible to an innocent explanation. But on review, we have no authority to reweigh the evidence. *Nusbaum*, 273 Va. at 408. We disagree with Jones's arguments on appeal, and find that the evidence supported a finding of intent.

In determining intent to permanently deprive, the finder of fact "may consider the conduct of the person involved and all the circumstances revealed by the evidence." *Welch v. Commonwealth*, 15 Va. App. 518, 524 (1992) (citation omitted). This is because "there is not one case in a hundred where the felonious intent in the original taking can be proved by direct evidence. From the nature of the case, intent, generally, must be inferred from circumstances." *Skeeter v. Commonwealth*, 217 Va. 722, 726 (1977). As a result, "the specific intent in the person's mind may, and often must, be inferred from that person's conduct and statements." *Welch*, 15 Va. App. at 524 (citations omitted).

At trial, the jury heard evidence that Brian S. was responsible for caregiver pay, which he managed through a separate payroll account. When confronted by Brian, Jones denied any knowledge of the suspicious payments from M.S.'s personal account. Despite clear confusion

- 13 -

about Jones's access, she denied any knowledge of the suspicious payments until interviewed by Detective Rogers three months later, at which point Jones claimed M.S. gave her access to help Jones pay off credit card debt. Only at the interview did Jones share the alleged agreement for upfront payment in exchange for later work—despite seemingly continuing to receive payment for her services on a regular basis from the payroll account. There was no other evidence of an "agreement for upfront payment" apart from Jones's account of it, and the jury was entitled to disbelieve Jones's assertion that she intended to return all $57,347.60 taken from M.S.'s account. *See Newsome v. Commonwealth*, 81 Va. App. 43, 55 (2024) ("[I]n its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." (quoting *Flanagan v. Commonwealth*, 58 Va. App. 681, 702 (2011))). The jury was not required to take Jones's claims as true, and on appeal, we are required to view them, and all other evidence, in the light most favorable to the Commonwealth, as the party that prevailed below at the trial court. *Sullivan*, 280 Va. at 676. Because we cannot say that the jury's finding was plainly erroneous, we affirm.

CONCLUSION

The General Assembly expanded the reach of Code § 18.2-178.1(B) to protect those who are "vulnerable adults" under Code § 18.2-369(C) from those who would take advantage of them for that vulnerability. The trial court correctly interpreted Code § 18.2-178.1(B) consistent with that legislative intent based on a plain reading of the statute, and Jones's conduct fits squarely within the statutory prohibition. Because there was sufficient evidence to support Jones's conviction, we affirm her conviction.

*Affirmed.*